12-14-89 SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS SANOFI-AVENTIS v. GLENMARK PHARMACEUTICALS Well, just substituting a double-ring configuration for a single-ring configuration would result in something beneficial. The newest ACE inhibitor, the ones that are claimed, that are recited in the claims, when the plenipryl came out, the prior art characterized it, and I'm quoting the prior art as saying it was unique. It had an extremely favorable therapeutic ratio. It was of long duration, and that's a distinction over captopril that everybody recognized. It was of long duration. It was a longer-duration drug. Even enalapril, which preceded it, was recognized as a longer-duration drug than captopril. Captopril was a three-times-a-day drug. Enalapril was a twice, maybe once. Quintapril was a once-a-day drug. Everyone recognized, and the prior art stated, that quintapril represented, I'm quoting here, a significant advance in hypertension therapy. No other ACE inhibitor at the time was described in those terms. Is there any evidence in the record as to why quintapril and trendolabril were selected in this combination by the inventors? Well, trendolabril comes from the same research organization. That's one reason. It's got some of the same co-inventors. Quintapril, as I'm quoting the prior art, it was recognized. It was the only new ACE inhibitor that was extolled in this manner. There's nothing else in this record that compares with the praise that was heaped on quintapril at the time. So that's good enough reason to include those two in that claim. Now, there were other... The patent claims thousands of possible ACE inhibitors. It's just claim three just limited the field to two possibilities. So the skilled person would have been motivated to make the exact substitution. It might have been motivated to make other substitutions as well, and that's part of the plaintiff's argument here. But that doesn't mean that the particular substitution is any less obvious. If there are lots of obvious combinations, you can't get a patent just by picking one. That's the Biocraft case. That's what that tells us. And there, there were 1,200 possible permutations and combinations. And the court said, this court said, all of them are obvious, so you don't get a patent for picking them, absent some special unexpected results perhaps that come out of that picking. And that didn't happen here. The results are all the results that flow from the properties of the two drugs themselves. The court was... District court was sidetracked, in our view, by irrelevancies. First of all, the number of rings in the molecule. The patent claims two rings. It claims three rings. There are two-ring molecules that are not covered. The Nasopril testimony is a two-ring molecule. It's not within the scope of the patent. Claim one covers three-ring molecules. If you put substituents on it, it covers ten-ring molecules. The two-ring molecule is a phrase that appears nowhere except in the transcript of this case. It's not a term of art at all. Now, the facts... The court also got distracted, as the jury did, I believe, by the fact that the new ACE inhibitors, quinopril and trandolpril, exhibited properties that the old ones did not. But these properties aren't properties of convention. These are properties that those drugs have. Those drugs are in the prior art. Their properties are part of the prior art. Whether or not people recognize that the drugs were acting in certain ways doesn't matter. They were, in fact, doing that in the prior art, regardless of whether somebody didn't measure those properties until later. They were there all along. So these inventors can't take credit for them, especially since they didn't recognize them either. Because all they did was choose quinopril and trandolpril for their recognized properties. Are you telling us there's no advantage to the combination? There is no unexpected advantage to the combination. The expectation, which everybody can see, is that the combination will exhibit the combined properties of the two ingredients because they act independently. That's what I was looking for in the prior art, and I couldn't find it. Where in the prior art does it say that this particular combination will have these particular properties? The expectation was from the captopril and calcium antagonist prior art that the properties are additive. That's clear from the data and the testimony. Well, the properties are additive for that combination, but not necessarily for other combinations. But that gives you an expectation of what other combinations are going to look like. Indeed, that's what happens. There were five references that discussed the properties of the combination, and in every one, the testimony from their expert was that the properties were indeed additive, just as the expectation would be. As everybody understood, these two drugs act independently on the system, and you would expect, therefore, that their properties would complement each other. And that is the expectation that is exactly realized out of this combination. The expectation is what's realized out of the analopril plus calcium antagonist combination in the Garkov pattern. Before you go too much in your time, regarding secondary considerations, you have a heading in your break that Tarka was a commercial disaster. If it was a commercial disaster, why does Glenmark want to get into the market? It was overall, it now has a small market, and Glenmark wants to take advantage of putting a product into that small market. Abbott spent several hundred million dollars promoting this product. They lost money. Abbott concedes that they lost $30 million on this product. That, to me, is a commercial disaster. It seems like a lot of money to me. And so the fact that they lost that money, that's why we call it a commercial disaster. But there is a small market. So you want to take advantage of the market that exists as a result of that expenditure. That's exactly right. There is a small market. It wasn't a disaster for your client, then. Well, so far it's not been all that great. We're enjoying it right now. Did the district court issue a final judgment? The district court issued what we regard as a final judgment, yes, Your Honor. As to the liability issues underlying? Yes, Your Honor. The only thing left, the district court issued an order on September 30th, 2011, which denied our pending motion for judgment as a matter of law. So left intact the verdict. Denied all our other motions. Granted plaintiff's motion for an injunction. And marked the case as closed. And directed the parties to submit a supplemental damages calculation. Is there any separate paper that indicates who wins and who loses? Well, the fact that Glenmark is enjoined is an indication that Glenmark lost, yes, Your Honor. Well, that's an inference, maybe a correct one, maybe the only one. But there's no document that says that. There's no document that says win-lose. But there's a document that comports with all the requirements for a final judgment. It's a single piece of paper. And it decides the only issue that's there other than the damages and willfulness. That's correct, Your Honor. It decides all the issues that are left in the case except damages. Leading into my rebuttal time, but I do want to address just one thing on standing, and that is there is only one agreement that matters on the standing issue, and that's the 2004 agreement. And that agreement grants an exclusive license to Abbott Germany, which is a separate corporate entity. It's related, but they maintain the corporate separateness from Abbott Laboratories. Am I correct that your argument is essentially that the evidence at best shows that Abbott Labs and ALI are exclusive distributors but not necessarily exclusive licensees? They are. Abbott Laboratories is an exclusive distributor. I'm sorry, Abbott Laboratories Inc. is an exclusive distributor from Abbott Laboratories. The testimony is, although there's no agreement, I believe, that Abbott Laboratories is a distributor for Abbott Germany. But nothing to indicate or imply that they were exclusive licensees. That is correct. They're just exclusive distributors. The license, the actual license to Abbott Laboratories is a non-exclusive license. It's a covenant not to sue. It is a written license. All right. We will save the rest of your time, Mr. Galbraith. Mr. Alcock. Thank you, Your Honor. May it please the Court. John Alcock representing Abbott. I'd like to briefly address the standing issue first and then the obviousness issue. On standing, what happened here, and there are other agreements that are material to the implied license that occurred, was that Abbott Labs bought Knoll, and Knoll carried with it the exclusive license to sell and use the combination product. At that point, Abbott Labs got the NDA and started selling in the U.S., and Knoll became Abbott Germany. So at that point in 2001, there was very clear intent among all the Abbott entities and Aventis, the exclusive licensee, that Abbott Labs be the exclusive licensee of the product and distributor and seller in the United States. I mean, I can understand how Abbott Germany would be considered an exclusive licensee. Well, at that point, Abbott Germany wasn't selling in the U.S. Abbott Labs got the NDA, and Abbott Labs was the only seller in the U.S. But that relates to sales or distribution, not necessarily a license. Well, it's the same as the Weinar case, Your Honor, and the Kalman case, where in both those cases, the exclusive licensee had one of the five bundles of rights, the right to sell, and this court found in both cases they were appropriately co-plaintiffs for lost profits, and that's the situation here. And so then when 2004 came along, the only thing that changed was Abbott Germany got the additional right to make from Aventis. It already had the rights to use and sell from the pre-existing purchase of Knoll, and the situation with Abbott Labs continued the same. All this was confirmed in the confirmatory license in 2010. And so it's very clear, and I believe the Kalman and Weinar cases are directly on point, that there's an implied license to Abbott Labs, Ann Alley, its distributor, to sell, and that's one of the five bundles of rights, and it's an exclusive license. So on the obviousness point, there are five implied findings on what I'll call the substantive case, the content of the prior art and the differences between the prior art and the invention, that flat out make this case a clear case of non-obviousness, and the jury was correct and supported by substantial evidence in coming to that conclusion, and the trial court was right in denying the JMOL. The five are these. One, that Glenmark's closest prior art, single-ring ACE inhibitors, was not an effective treatment. It suffered from a handful of problems. One, it was short-acting. Second, that caused patient compliance problems. Third, it caused difficulties in being effective, and therefore wasn't an effective treatment because of harmful swings in blood pressure. So the closest prior art, by their own admission, had all those problems, and it did not have the additional unexpected benefits that the invention had of improving the blood vessel function and improving kidney function. So the closest prior art actually taught away from the invention because the closest prior art, the single-ring ACE inhibitor with the calcium antagonist, exemplified the shortcomings. It didn't teach causing the combination. Second, no prior art disclosed any of those benefits with the double-ring combination and the calcium antagonist. In answer to the court's question on this point, the court was right. No prior art disclosed that the combination of an ACE inhibitor and a calcium antagonist would create longer duration, would create improved kidney function, would create improved blood vessel function. That was the discovery of the inventor. Are those benefits that you just recited the result of the combination or the result of the different ACE inhibitor? They're the result of the combination, which is in part the discovery that the different ACE inhibitor would contribute to that, which brings me to the next point on which there was extremely disputed evidence, which is quinopril, the only double-ring ACE inhibitor that was discussed much at trial in terms of the prior art. There were four references. Our expert went through those one by one and clearly established that the quinopril references established that it was no better than the single-ring that was the prior art that had all those deficiencies. So the trial evidence on this point was that the quinopril was no better and suffered all of the same defects as the single-ring inhibitors. Now that's really important because those quinopril references were around for a few years, right during the time period where the inventor was doing his invention. And the court asked, well, how was it that the inventor came up with these? The inventor came up with these by thinking to do experiments that the inventors of quinopril who authored some of these articles didn't themselves think to do. But in terms of quinopril alone, the fact that quinopril was a known drug at the time, that it would not be an active invention, would it, for someone to discover later that quinopril had certain properties that weren't previously recognized? It certainly is an active invention that you discover that that chemical in combination with a calcium antagonist had all these benefits. That's what I'm getting at because the fact that the benefit was simply a recognition that hadn't been previously understood of the quinopril, not necessarily the combination, doesn't make it inventive, does it? Well, I'm not sure, but that's not this case. I mean, I can imagine a case where there's a drug out there that no one knows it has the benefits of, someone discovers that it does have the benefits to be effective treatment for high blood pressure, and that alone is a discovery. But that's not this case. What this case is, is the discovery that quinopril and or trandolopril and or double ring, that combination with a calcium antagonist had the benefits that I just described, and no one before had discovered that, and that the prior art, the single ring plus calcium antagonist, actually would have discouraged people from going down this path because it led them in the opposite direction because it didn't have any of the benefits nor any indication or suggestion that that combination had any of the benefits. So that's the third implied finding. And then the fourth, which is really important here, is the underlying assumption of their argument is that, well, now a calcium antagonist and an ACE inhibitor must be an improvement. Well, at the stage of the record, there were thousands of approaches one could take with different kinds of ACE inhibitors, not the two that were selected in this claim, and different kinds of other additives, not calcium antagonists. There were thousands of approaches, and nothing to suggest that the selection of the double ring with the calcium antagonist or these two particular double rings with the calcium antagonist would provide these benefits. So there was a myriad of potential options, and the evidence at trial was it was this inventor's insight in figuring out which experiments to conduct to determine that this combination would provide these benefits. Is there any evidence to indicate why the inventors selected these two? I think it falls into the category of inventive insight, Your Honor. The record is that he looked at hundreds of ACE inhibitors over a five-year period from 1980 to about 1985 or 86, the time of invention, literally hundreds of different ACE inhibitors. And at some point, he got the intuition that the double ring approach would have some of these benefits, in particular the long-lasting benefits. There is no evidence to suggest that the individual ACE inhibitors had those special benefits? None. Absolutely none. And even though, during that same time period that he was performing those experiments, the inventors of Quinepril, who were the authors of the four articles that were in evidence at trial, they didn't figure it out. They're the ones that came up with the drug and they didn't figure it out that that had the benefits or didn't have the benefits in combination with the calcium antagonist. They themselves, even though there was the single ring combinations that they point to, they were around, they didn't suggest combining Quinepril with the calcium antagonist. And why not? Well, because the single ring plus calcium antagonist was a failure. It had all the problems that the invention here was trying to address. So, why would you combine a double ring with a single ring? So, that's the fourth point, that there were literally 300 ACE inhibitors that all had the same type level of response as Quinepril or Enalapril or Captopril. And no one figured out that the double ring or these two particular double ring in combination with calcium antagonist would have these benefits, except for the inventor who did it because he experimented with a bunch of different options over a period of years and had this inventive insight. And so then the last implied finding supportive of this is that this notion of putting two of these in a single pharmaceutical combination, a single pill, fixed dose, was actually counter to what was conventional thinking at the time with high blood pressure treatment. High blood pressure treatment for years before and including years after this was the stepped care approach where basically you take a single ingredient, not an ACE inhibitor, by the way, during any of this time period, a diuretic or a beta blocker, and step that up and then if that didn't work you would select one of a very wide range of other combinations. In 1984 and 1985, not an ACE inhibitor, by the way, they were not on the list even then. And you would select one of those. There were literally hundreds of combinations that you would select from, but not two as a fixed dose together because that would be counter to this stepped care approach. And that was the approach in 1984, 1986, and even years after. So this inventor was counter to conventional thinking by saying, no, I'm going to put a fixed pharmaceutical combination, one pill, that doesn't allow for the stepped care approach which was the state-of-the-art thinking at the time. And then the last point I'll make, Your Honor, is the closest prior art that they point to is the Gartoff single ring enalapril with a calcium antagonist. That was considered by the Patent Office in a specific office action where they say that there's no evidence that that points to any of the advantages of the invention. So on what I'll call the case in chief on obviousness, on the content of the prior art and the differences between the prior art and the invention, there are five implied findings that are supported by substantial, even overwhelming evidence in some cases that counter the contention that they're making on appeal. Then with respect to the objective indicia of obviousness, there's substantial evidence supporting four of the objective indicia. One is long felt need. There was substantial evidence at trial that these problems that I identified, no improvement in kidney function, no improvement in blood pressure, no short-acting problem, had plagued the high blood pressure field for years. And this was the first time that anyone had come up with a solution to all those problems. Secondly, there was evidence of unexpected results, lots of evidence of unexpected results. The kidney improvement and the blood vessel improvement were not known at the time as well as the long-acting thing was not known at the time. And your honor, many of those studies are directed right to the combination, that the combination is what produces the unexpected benefits, not a single drug alone. Many of those studies, Gavris, Bacris, and others cited in them. And then finally, the commercial success in common, which kind of go hand in hand as the court was asking. I mean, 100 million in one year is successful. 65 million even three years after they stopped marketing the drug is successful. And the fact that Glenmark wants to copy it and in the short time period that they did sell achieved revenues of 15 million dollars in a very, very short period indicates that it is a successful drug. And so the four objective indicia all go to it. What about Mr. Galbraith's claim that it's a commercial disaster? It's not a commercial disaster. I mean, just because you spend a lot on marketing in the early stages, that's the way the business is. I mean, the revenues are substantial. The key to the plaintiff's argument on standing is the assertion that Knoll, which became Abbott Germany, had a license, an exclusive license, under this patent. There is no evidence that that's true. That is not the case. Knoll never had a license under this patent. Knoll was licensed by a French company called Roussel-le-Cloth. Roussel-le-Cloth never owned any rights in the 244 patent. At the time the license to Knoll was executed, the 244 patent didn't exist. There was an application for it. It was owned by a company called Hertz, a German company. Knoll did not, I mean, I'm sorry, so Knoll never acquired an exclusive license until 2004 when it was then part of, then after it had been acquired by Abbott and renamed Abbott Germany. So that, the idea... Weren't they able to sub-license before that date? No, because they didn't have any rights. That's the first rights that ever went to Abbott Germany were in the 2004 agreement. So your position is that you are subject to multiple litigation in the United States by some other entity with the right to sue you? I'm not sure that's a practical issue now because of where we are, but the fact of the matter is the statute requires that only the patent owner can recover damages. And under this court's jurisprudence, the patent owner means a company, means an entity that has the exclusive right, that has the exclusive license under the patent. And in the Weimar case, there was an exclusive oral license, the courts have found. And in the Kalman case, all parties treated the corporate plaintiff as an alter ego of the patent owner. So those cases are distinguishable. With respect to these properties, there are no properties, no one has ever identified a property of the claimed combination that is not wholly attributable to a property of one of its components. There is no evidence in this record that any property, unexpected or otherwise, can be attributed to the combination, to the invention we're talking about. Every property is exactly the expectation from the properties of each of the individual components. That's why there is no unexpected property here, and that's why this is not a patentable invention. Thank you. Thank you, Mr. Galbraith and Mr. Alcock. The case is taken under submission.